IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, ex rel. )
GREGORY JOHNSON #B06569, )
                                   )
              Petitioner,          )
                                   )
         v.                        )    No. 06 C 5352
                                   )
TERRY McCANN, Warden, Stateville   )
Correctional Center,               )
                                   )
              Respondent.          )

## MEMORANDUM OPINION AND ORDER

This action is before this Court on remand from our Court of
Appeals, which has directed that the numerous grounds asserted by
habeas petitioner Gregory Johnson ("Johnson") in his 28 U.S.C.
§2254[1] Petition for Writ of Habeas Corpus ("Petition") be
addressed on an individualized basis, rather than by subscribing
to the extraordinarily detailed and qualitatively solid Answer
filed by Assistant Attorney General Charles Redfern. This
opinion responds to that directive in substantive terms, for
which purpose two portions of the Answer are attached to serve as
a backdrop for that substantive analysis:

    1. **Ex.** 1 comprises Answer pages 1-10, which set out
    the procedural history of Johnson's state court proceedings
    that preceded his current effort to obtain federal habeas
    relief, as well as identifying the ten grounds that Johnson

---

[1] All further references to Title 28's provisions will
simply take the form "Section--."

advances in his current Petition. During the ensuing
discussion Johnson's initial state petition for post-
conviction relief will be referred to as "P-C I," while his
unsuccessful effort to pursue a second state post-conviction
proceeding--rejected, as hereafter explained, because of his
failure to comply with state procedural requirements--will
be cited "P-C II." Johnson's ten grounds for seeking habeas
relief, as set out in his current Petition, are described at
pages 7 and 8 of Ex. 1.[2]

2.  Ex. 2 comprises Answer pages 11-19 and sets out the
factual background of the case leading to Johnson's
conviction, a description drawn (as the Answer at 11 states)
from the Illinois Appellate Court's accounts in the course
of its three opinions, one on direct appeal, one on the
appeal in conjunction with P-C I and the third on the
attempted appeal in P-C II. As the Answer at 11 correctly
states, that source is entirely appropriate as taught by
such cases as Rice v. Collins, 546 U.S. 333, 338-39 (2006).

_____

[2]  There is some disconnect between the numbering in the
Petition and in the Answer: For example, what the Petition's
Mem. 6 lists as Johnson's ninth ground is listed as Claim Eight
in the Answer. Because the attached pages from the Answer are
much easier to follow than the description in the Petition and
because the ten claims addressed in the Answer do cover the
waterfront as to all of Johnson's grounds, this opinion will
employ the Answer's numbering.

2

## Procedural Defaults

Four of Johnson's grounds--Claims 1, 5 and 7 and the bulk of
Claim 10--stand (or more accurately fall) on an identical
footing. None was raised on direct appeal; all were advanced in
P-C I but were not then taken up the appeal line to the Illinois
Appellate Court and the Illinois Supreme Court; then all were
again sought to be advanced in P-C II, but leave to file that
second post-conviction petition in the state court was denied for
failure to comply with a procedural requirement established by
state law.

That history confirms the procedural default of each of
those claims under the teaching of O'Sullivan v. Boerckel, 526
U.S. 838, 845 (1999) and such cases from our Court of Appeals
applying Boerckel as Guest v. McCann, 474 F.3d 926, 929-30 (7th
Cir. 2007). And to the extent that Johnson might seek to invoke
P-C II as an escape hatch, any such effort fails because Illinois
law treats such an unauthorized second post-conviction petition
as an unfiled document--see People v. LaPointe, 227 Ill.2d 39,
879 N.E.2d 275 (2007), citing 725 ILCS 5/122-1(f). That of
course constitutes an independent procedural default.

There is only one partial exception to that analysis:
Claim 10 includes a contention that Johnson's appellate counsel
did not advance claims related to the testimony of Scott Coleman
("Coleman") as an alleged alibi witness. That partial exception

3

will be dealt with on the merits later.

Next, three of Johnson's other grounds--Claims 4, 6 and 9--pose a different scenario, but those are procedurally defaulted as well. Each of them was not raised on direct review, and each was then advanced in P-C I but was not then taken up the appellate line. Unlike the four claims previously discussed, none of those three was reasserted in P-C II. Under those circumstances procedural default under Boerckel and its progeny applies with equal (if not greater) force.[3]

Finally on the procedural default front, Claim 3 was raised in Johnson's direct appeal. But the Illinois Appellate Court held the argument had been waived (more accurately, forfeited) because no offer of proof had been made as to witness Truell's testimony, nor had the issue been raised in a motion for new trial. Those factors provide a classic example of procedural default, which is not altered by the Appellate Court's alternative discussion of the issue on the merits--in that respect see, e.g., Harris v. Reed, 489 U.S. 255, 264 n.10 (1989).

With all of the just-discussed claims having been procedurally defaulted (subject to the minor exception within Claim 10 that has been referred to above and is discussed later),

---

[3] Claims 6 and 9 were later injected into the petition for leave to appeal the rejection of P-C II to the Illinois Supreme Court--a bizarre and futile effort, given the absence of those claims from P-C II itself.

4

the only potential for their preservation lies in a showing of either (1) cause and prejudice or (2) a fundamental miscarriage of justice. As to the first of those, Guest, 474 F.3d at 930 reconfirms the holding of McCleskey v. Zant, 499 U.S. 467, 493 (1991) as to the operative standard that must be met, while as to the second alternative a petitioner must show the probable conviction of someone who is actually innocent (see, e.g., Dellinger v. Bowen, 301 F.3d 758, 767 (7th Cir. 2002), citing Schlup v. Delo, 513 U.S. 298, 327 (1995)).

All that could conceivably meet the cause-and-prejudice test in Johnson's case are (1) two letters that Johnson says he wrote to Sarah Curry, his appointed counsel on his P-C I appeal to the Illinois Appellate Court, and (2) some assistance that Johnson says he received from fellow inmate Melvin Wilson (something mentioned in his P-C II petition). As to the first of those, it founders on more than one ground--most basically on the well-established principle that no federally cognizable claim of ineffective assistance of counsel can be based on the work of counsel in post-conviction proceedings (see, e.g., Powell v. Davis, 415 F.3d 722, 727 (7th Cir. 2005)). And any attempt by Johnson to point to his asserted reliance on inmate Wilson is noncognizable federally on an a fortiori basis. Lastly, as for any possible notion of actual innocence, the substantive discussion of the evidence in the Illinois Appellate Court's

opinions completely scotches any such potential claim.

In sum, all of Johnson's claims other than Claim 2, Claim 8 and a portion of Claim 10 are procedurally defaulted and need not be addressed on the merits.[4] This opinion turns then to those remaining claims and portions of claims.

First, as to Claim 2 Johnson confronts the always difficult hurdle of challenging the sufficiency of the evidence supporting his conviction. In that respect the Illinois Appellate Court's September 27, 2002 order disposing of Johnson's direct appeal (No. 1-00-2464, reproduced as Ex. E to the Answer) is "[t]he relevant decision for purposes of [federal habeas] assessment" (Charlton v. Davis, 439 F.3d 369, 374 (7th Cir. 2006)), because that was "the last state court to rule on the merits of the petitioner's claim" (id.). And the Appellate Court's discussion of the sufficiency-of-the-evidence issue (Ex. E at 8-10) was plainly neither "contrary to [nor] involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," as Section 2254(d)(1) states the test--see the seminal opinion in Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original):

---

[4] To be sure, an extensive portion of the Answer goes on to demonstrate that all of Johnson's procedurally defaulted claims also fail on the merits. This opinion will not however heap Pelion upon Ossa by reviewing the procedurally defaulted claims in those terms, turning instead to the limited aspects of Johnson's submission that require a merits-based analysis.

6

> Instead, the relevant question is whether, after
> viewing the evidence in the light most favorable to the
> prosecution, <u>any</u> rational trier of fact could have
> found the essential elements of the crime beyond a
> reasonable doubt.

Nor, as a simple reading of the Illinois Appellate Court's

decision confirms, can it be said that the adjudication "resulted

in a decision that was based on an unreasonable determination of

the facts in light of the evidence presented in the State court

proceeding" (the alternative test under Section 2254(d)(2)).

Next, as to Claim 8 and part of Claim 10, the familiar

yardstick for evaluating the constitutional adequacy or

inadequacy of representation by counsel is set out in <u>Strickland</u>

<u>v. Washington</u>, 466 U.S. 668 (1984). On that score the asserted

deficiency in counsel's representation by failing to call Coleman

as a purported alibi witness was dealt with in detail by the

Illinois Appellate Court's July 28, 2005 order upholding the

dismissal of Johnson's P-C I (No. 1-04-0132, reproduced as Ex. M

to the Answer). That order analyzed Johnson's claim under the

<u>Strickland</u> standard with care and concluded that the claim was

without merit (Ex. M at 9-13).

Once again the standard for this Court's resolution of those

claims by Johnson is prescribed by Section 2254(d). In that

regard the Illinois Appellate Court not only cited <u>Strickland</u> but

was meticulous (and substantively correct) in applying its

teaching. Hence Claims 8 and 10 fail as well.

## Conclusion

For the reasons stated in this opinion, Johnson's Petition has failed in all respects. No evidentiary hearing is warranted (see Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts), and Rule 4 of those same Rules can appropriately be adapted to support a holding that "it plainly appears from the petition and [the Answer and] any attached exhibits that the petitioner is not entitled to relief in the district court." Accordingly this Court so holds, and the Petition and this action are dismissed.

Milton I. Shadur
Senior United States District Judge

Date:   October 10, 2008

8

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. GREGORY JOHNSON,<br>B06569, | ) ) ) | |
| Petitioner, | ) ) ) | |
| v. | ) ) ) | No. 06 C 5352 |
| DEIRDRA L. BATTAGLIA, Warden,<br>Stateville Correctional Center,[1] | ) ) ) | The Honorable<br>Mark Filip, |
| Respondent. | ) | Judge Presiding. |

## ANSWER TO PETITION FOR A WRIT OF HABEAS CORPUS

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United

States District Courts and this Court's order of January 10, 2008 (Doc. 20),

respondent Terry McCann hereby files this Answer to petitioner's Petition for a

Writ of Habeas Corpus filed in the above-captioned cause, and states as follows:

## I.    PROCEDURAL HISTORY

1.    Petitioner Gregory Johnson, identified as prisoner B06569, is

incarcerated at the Stateville Correctional Center in Joliet, Illinois, where he is in

the custody of Warden Terry McCann.

---

[1] Terry McCann is currently the warden at Stateville Correctional Center
where petitioner is presently imprisoned and therefore should be substituted in
place of the named respondent Deirdre L. Battaglia. *See* Rule 2(a) of the Rules
Governing Section 2254 cases in the United States District Courts; Fed. R. Civ. P.
25(d)(1); *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (citing *Hogan v. Hanks*, 97
F.3d 189, 190 (7th Cir. 1996)); *Bridges v. Chambers*, 425 F.3d 1048, 1049-50 (7th
Cir. 2005).

Ex 1  p. 1

2.    In 2000, following a bench trial in the Circuit Court of Cook County, petitioner was convicted of first degree murder for the shooting death of Eugene Perry and sentenced to 35 years' imprisonment. (Exhibit A at 5, 7; Exhibit E at 1; Exhibit M at 1; Exhibit U at 5). On direct appeal to the Appellate Court of Illinois, petitioner argued that:

> A.   the State had failed to prove its case beyond a reasonable doubt;
>
> B.   he was denied a fair trial because the trial court sustained the State's objections to his cross examination of Victor Truell; and
>
> C.   the trial court should have engaged in a *sua sponte* examination of a possible claim of ineffective assistance of counsel regarding the failure to present an alibi witness pursuant to *People v. Krankel*, 464 N.E.2d 1045 (Ill. 1984).

(Exhibit B at 2; Exhibit E at 1-2). On September 27, 2002, the appellate court affirmed. (Exhibit E at 2, 21). Petitioner filed a pro se Petition for Leave to Appeal (PLA) in the Supreme Court of Illinois raising the same three arguments he raised in the appellate court. (Exhibit F at 3-4). The Supreme Court of Illinois denied the PLA on February 5, 2003. (Exhibit G). Petitioner did not file a petition for a writ of certiorari to the Supreme Court of the United States. (Pet. at 2).

3.    On May 27, 2003, petitioner filed a petition for postconviction relief pursuant to 725 ILCS 5/122-1, *et seq.* in the Circuit Court of Cook County. (Exhibit A at 8; Exhibit H). Petitioner argued that:

> A.   The trial court erred by:
>
> > 1.   sustaining the State's objection with respect to questions by defense counsel as to witness Clark's grand jury testimony;

Ex. 1 p. -2-

       2.    rendering a guilty verdict that was against the manifest weight of the evidence;

       3.    finding petitioner guilty when the verdict conflicts with trial court's findings of fact;

       4.    finding petitioner guilty when the trial court also found that Truell was not credible;

       5.    sustaining the prosecutor's objections during the cross examination of witness Truell;

       6.    sentencing petitioner to 35 years' imprisonment with 100% of the sentence to be served; and

       7.    denying petitioner his confrontation clause rights as to the statement that petitioner made to Clark;

B.    The State's Attorney committed misconduct by allowing Clark and Truell to knowingly give false testimony because:

       1.    Clark testified that the gun used in the crime was silver when the information in the police reports demonstrate that the prosecutors knew that the gun was blue; and

       2.    Truell's entire trial testimony was a lie and contradicted by his prior statement to petitioner's attorneys;

C.    He was denied effective assistance of trial counsel because trial counsel failed to:

       1.    visit the crime scene;

       2.    argue that there was an alibi witness, Scott Coleman;

       3.    present the testimony of Scott Coleman; and

       4.    present any type of defense; and

D.    He was denied effective assistance of appellate counsel by the failure to raise on direct appeal the issues raised in his postconviction petition.

Ex.1  p.  -3-

(Exhibit H at 2-8; Exhibit I at 1). The circuit court dismissed the petition on August

7, 2003. (Exhibit A at 9; Exhibit I at 9). On appeal, petitioner argued that:

> A. his trial counsel was ineffective for failing to call the alibi
> witness, Scott Coleman, to testify at trial; and
>
> B. his appellate counsel was ineffective for failing to raise the Scott
> Coleman alibi issue on direct appeal.

(Exhibit J at 2; Exhibit M at 1). The appellate court affirmed the judgment

dismissing the postconviction petition. (Exhibit M at 1, 13). Petitioner filed a pro

se PLA in the Supreme Court of Illinois, raising the same two arguments he raised

in the appellate court. (Exhibit N). The Supreme Court of Illinois denied the PLA

on December 1, 2005. (Exhibit O). Petitioner did not file a petition for a writ of

certiorari to the Supreme Court of the United States.

4. On November 12, 2004, petitioner filed a second postconviction petition

pursuant to 725 ILCS 5/122-1, *et seq.* in the Circuit Court of Cook County. (Exhibit

A at 10; Exhibit P). Petitioner argued that:

> A. he was denied his constitutional right to be present at a critical
> stage in the proceedings because he was absent when one of his
> attorneys was disqualified from participating in the trial;
>
> B. he was denied due process because the prosecution failed to
> correct the false testimony of witnesses;
>
> C. his due process and equal protection rights were violated when
> the trial court repeatedly failed to allow his counsel to impeach
> state witnesses;
>
> D. he received ineffective assistance of trial counsel because trial
> counsel:

$$\mathbb{E}x.1 \quad p. \quad -4-$$

1.    unreasonably withdrew a motion to quash the petitioner's arrest;

2.    unreasonably withdrew a motion to suppress evidence;

3.    failed to file a motion to suppress the state's eyewitness identification evidence as "suggestive";

4.    failed to investigate police misconduct and abuse during police interrogations;

5.    failed to investigate the circumstances surrounding the police questioning of Clark and Turell;

6.    failed to locate additional witnesses who would have supported the defense;

7.    failed to follow up on inconsistent statements given by Clark and Turell when compared to prior statements given to the police and before the grand jury;

8.    failed to impeach Clark on her prior inconsistent statements;

9.    failed to impeach Turell on his prior inconsistent statements;

10.    failed to produce an alibi witness for petitioner;

11.    failed to familiarize himself with the crime scene;

12.    failed to obtain 911 tapes for the case; and

13.    failed to conduct an investigation into another person who could have been the potential shooter;

E.    the evidence at trial failed to prove his guilt beyond a reasonable doubt; and

F.    he was denied effective assistance of appellate counsel for failing to raise these issues on direct appeal.

Ex. 1 p. -5-

(Exhibit P at 17-19). On January 13, 2005, the circuit court denied petitioner leave

to file the second postconviction petition. (Exhibit A at 10; Exhibit Q). The circuit

court held that petitioner's claims "are procedurally barred and are frivolous and

patently without merit." (Exhibit Q at 6). On appeal, petitioner argued that:

- A.  his Sixth Amendment right to counsel of choice was violated;

- B.  his Due Process rights were violated when counsel of his choice
      was disqualified at a critical stage in the proceedings and
      outside of his presence; and

- C.  he satisfied Illinois's cause and prejudice test allowing for a
      second or successive postconviction petition.

(Exhibit R at i, ii). On March 15, 2007, the appellate court affirmed holding that

petitioner could not satisfy Illinois's cause and prejudice requirement necessary for

the filing of a second or successive state postconviction petition. (Exhibit U).

Petitioner filed a pro se PLA in the Supreme Court of Illinois, where he argued that:

- A.  the State failed to prove his guilt beyond a reasonable doubt;

- B.  he was denied a fair trial because the trial court limited defense
      counsel's cross examination of witnesses;

- C.  he was denied effective assistance of trial counsel;

- D.  he was denied effective assistance of appellate counsel;

- E.  the trial court erred in sustaining the State's objections to
      defense counsel's question to witnesses regarding the
      consistency of grand jury and trial testimony;

- F.  the verdict was against the manifest weight of the evidence;

- G.  he was denied his right of confrontation when his alleged
      statement to Clark, which was disclosed during Clark's
      testimony, was not subject to cross examination;

$\text{Ex. } | \text{ p. -6-}$

> H.      the trial court erred in granting the State's objections during defense counsel's examination of witness Truell;
>
> I.      his sentence was disparate when compared to similarly situated defendants;
>
> J.      the Assistant State's Attorney committed misconduct; and
>
> K.      his Due Process rights were violated under the 5th and 14th Amendments.

(Exhibit V at 2). The Supreme Court of Illinois denied the PLA on September 26, 2007. (Exhibit W). Petitioner did not file a petition for a writ of certiorari to the Supreme Court of the United States.

     5.      On October 2, 2006, petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1). As petitioner's second postconviction petition was then pending in the Illinois state courts, this Court dismissed without prejudice the October 2, 2006 habeas petition for failure to exhaust state remedies and granted petitioner leave to reinstate following the exhaustion of state remedies. (Doc. 10). On October 29, 2007, petitioner filed a motion to reinstate his habeas petition stating that he had exhausted his state court remedies. (Doc. 11). This Court granted the motion to reinstate on November 14, 2007 and ordered respondent to answer or otherwise plead. (Doc. 12). In the present habeas petition, petitioner alleges that:

> Claim One:      the trial court abused its discretion in sustaining the State's objection to the introduction of Clark's grand jury testimony to impeach her trial testimony;
>
> Claim Two:      the guilty verdict was against the manifest weight of the evidence;

Claim Three: the trial court erred by limiting petitioner's cross examination of Truell;

Claim Four: the trial court erred by reaching a guilty verdict when, sitting as the finder of fact, it found Truell not credible;

Claim Five: the prosecutor used perjured in-court testimony as demonstrated by the witnesses' prior inconsistent statements;

Claim Six: his sentence was disparate to other similarly situated defendants;

Claim Seven: he received ineffective assistance of trial counsel because trial counsel did not view the crime scene in order to prepare a complete defense

Claim Eight: he received ineffective assistance of trial counsel because trial counsel did not present the alibi witness, Scott Coleman, in the defense;

Claim Nine: his Sixth Amendment confrontation rights were violated because the out-of-court statement that petitioner made to witness Clark was not subject to cross-examination; and

Claim Ten: he received ineffective assistance of appellate counsel for failing to raise these issues on appeal.

6. In compliance with Rule 5 of the Rules Governing Section 2254 Cases

in the United States District Courts, respondent has filed Exhibits A-CC, with the

Clerk of this Court, under separate cover:

Exhibit A: Docket Sheet, *People v. Johnson*, No. 99 CR 344, Circuit Court Cook County;

Exhibit B: Petitioner's Opening Brief on Direct Appeal, *People v. Johnson*, No. 1-00-2464 (Ill. App.);

Exhibit C: State's Brief on Direct Appeal, *People v. Johnson*, No. 1-00-2464 (Ill. App.);

Exhibit D:    Petitioner's Reply Brief on Direct Appeal, *People v. Johnson*, No. 1-00-2464 (Ill. App.);

Exhibit E:    Rule 23 Order, *People v. Johnson*, No. 1-00-2464 (Ill. App. Sept. 27, 2002);

Exhibit F:    Petition for Leave to Appeal to the Supreme Court of Illinois, ·*People v. Johnson*, No. 95113;

Exhibit G:    Order Denying Leave to Appeal, *People v. Johnson*, No. 95113 (Feb. 5, 2003);

Exhibit H:    Petitioner's Petition for Postconviction Relief, No. 99 CR 344, Circuit Court of Cook County (May 27, 2003);

Exhibit I:    Order Denying Petitioner's Petition for Postconviction Relief, No. 99 CR 344, Circuit Court of Cook County (Aug. 7, 2003);

Exhibit J:    Petitioner's Opening Brief on First Postconviction Appeal, *People v. Johnson*, No. 1-04-0132 (Ill. App.);

Exhibit K:    State's Brief on First Postconviction Appeal, *People v. Johnson*, No. 1-04-0132 (Ill. App.);

Exhibit L:    Petitioner's Reply Brief on First Postconviction Appeal, *People v. Johnson*, No. 1-04-0132 (Ill. App.);

Exhibit M:    Rule 23 Order, *People v. Johnson*, No. 1-04-0132 (Ill. App. July 28, 2005);

Exhibit N:    Petition for Leave to Appeal to the Supreme Court of Illinois, *People v. Johnson*, No. 101244;

Exhibit O:    Order Denying Leave to Appeal, *People v. Johnson*, No. 101244 (Dec. 1, 2005);

Exhibit P:    Petitioner's Second Petition for Postconviction Relief, No. 99 CR 344, Circuit Court of Cook County (Nov. 12, 2004);

Exhibit Q:    Order Denying Petitioner Leave to File a Successive Petition for Postconviction Relief, No. 99 CR 344, Circuit Court of Cook County (Jan. 13, 2005);

Ex 1 p. -9-

Exhibit R:  Petitioner's Opening Brief on Second Postconviction Appeal, *People v. Johnson*, No. 1-05-0467 (Ill. App.);

Exhibit S:  State's Brief on Second Postconviction Appeal, *People v. Johnson*, No. 1-05-0467 (Ill. App.);

Exhibit T:  Petitioner's Reply Brief on Second Postconviction Appeal, *People v. Johnson*, No. 1-05-0467 (Ill. App.);

Exhibit U:  Rule 23 Order, *People v. Johnson*, No. 1-05-0467 (Ill. App. Mar. 15, 2007);

Exhibit V:  Petition for Leave to Appeal to the Supreme Court of Illinois, *People v. Johnson*, No. 104778;

Exhibit W:  Order Denying Petition for Leave to Appeal, *People v. Johnson*, No. 104778 (Sept. 26, 2007);

Exhibit X:  Transcript of Surbeaz Clark's trial testimony, *People v. Johnson*, No. 99 CR 344, Circuit Court of Cook County (Feb. 29, 2000);

Exhibit Y:  Transcript of Victor Truell's trial testimony in the People's Case-In-Chief, *People v. Johnson*, No. 99 CR 344, Circuit Court of Cook County (Feb. 29, 2000);

Exhibit Z:  Transcript of Victor Truell's trial testimony in the Petitioner's Case-In-Chief, *People v. Johnson*, No. 99 CR 344, Circuit Court of Cook County (Mar. 1, 2000);

Exhibit AA:  Transcript of hearing on State's pretrial motion to disqualify petitioner's counsel, *People v. Johnson*, No. 99 CR 344, Circuit Court of Cook County (Feb. 18, 2000);

Exhibit BB:  Transcript of trial court's findings of fact at the conclusion of the bench trial, *People v. Johnson*, No. 99 CR 344, Circuit Court of Cook County (Mar. 1, 2000);

Exhibit CC:  Map information of area surrounding the intersection of Roosevelt and Throop in Chicago, Illinois as available at Google Maps (last visited on January 28, 2008).

It is unnecessary to file the complete state court record with this Court at this time. *See Simental v. Matrisciano*, 363 F.3d 607, 612 (7th Cir. 2004) (decision of whether transcripts are necessary left to sound discretion of the district court; review of state court transcripts quite rare); *Kines v. Godinez*, 7 F.3d 674, 677 (7th Cir. 1993) (where federal habeas petitioner does not "identify any inaccuracies or incompleteness" in the appellate court factual summaries, a federal habeas court may exclusively rely on those factual summaries in adjudicating the claims contained in the habeas petition). In compliance with Rule 5, respondent reports that the state court record, consisting of 13 volumes, is in the custody of the Circuit Court of Cook County.

## II.    FACTUAL BACKGROUND

The following factual recitation is taken from the state appellate court's decision on direct appeal, (Exhibit E), first postconviction appeal, (Exhibit M), and second postconviction appeal, (Exhibit U), unless other citation is provided. The "state court factual findings . . . are presumed correct," and "the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) (quoting 28 U.S.C. § 2254(e)(1)); *see, e.g., Amerson v. Farrey*, 492 F.3d 848, 852 (7th Cir. 2007).

On December 2, 1998, at approximately 6:00 p.m., Eugene Perry was shot at the Fish World restaurant located at Roosevelt Road and Throop Street in Chicago, Illinois. (Exhibit E at 2; Exhibit M at 1; Exhibit U at 3). Perry died two days later.

(*Id*). Roosevelt Road has two lanes running in each direction and a turn lane. (Exhibit E at 2). At the time of the shooting, the area was illuminated by street lights, lights from passing cars, lights from overhead signs and a light at a nearby bus stop. (*Id*).

The state presented testimony from two eyewitnesses who identified petitioner as the shooter: Surbeaz Clark and Victor Truell. Clark witnessed the shooting while she was standing on the street outside Fish World approximately 20 feet from petitioner. (Exhibit E at 4). Truell was inside Fish World next to Perry when the shooting occurred. Clark had known petitioner from the neighborhood for approximately one year prior to the shooting. (Exhibit E at 2; Exhibit M at 2). Petitioner was known around the neighborhood as "Stan." (*Id*). Truell had known petitioner for approximately 30 years and had been friends with him. (Exhibit E at 5; Exhibit M at 3). Truell had know Perry since childhood. (Exhibit E at 4). Clark did not know Truell at the time of the shooting. (Exhibit E at 7).

Approximately two hours before the shooting in the area of Fish World, Clark saw petitioner and the two of them had a conversation. (Exhibit E at 2; Exhibit M at 2). Petitioner was wearing a black coat with a black hood, a shirt with a black hood and black jeans. (*Id*). The two parted ways, and Clark did not see petitioner

Ex 2 p. 2

again until approximately 6:00 p.m.[2] that evening, when Clark saw petitioner shoot into Fish World. (*Id*).

Standing outside Fish World, Clark saw petitioner open the door to Fish World with one hand while he shot into the restaurant using the gun in his other hand. (*Id*). Clark heard approximately four shots and saw sparks coming from the end of the gun in petitioner's hand. (*Id*). As petitioner turned to flee the scene, Clark observed his face and saw him put his hand in his pocket. (*Id*). As he fled, petitioner pulled the hood up onto his head. (*Id*).

At the time of the shooting, Truell and Perry were standing in the corner of the restaurant waiting for food that they had ordered. (Exhibit E at 4-5; Exhibit M at 4). The restaurant door opened and Truell heard two gun shots. (Exhibit E at 4; Exhibit M at 4). Truell dropped to the ground and placed his hands over his head. (*Id*). He then heard five or six additional shots. (*Id*). After hearing the additional shots, Truell looked up from underneath his left arm, which was still over his head, and witnessed petitioner leaving the restaurant with a pistol in his hand. (Exhibit E at 4-5; Exhibit M at 4). Truell testified that he saw the side of petitioner's face as petitioner was leaving the restaurant after the shooting. (Exhibit E at 5; Exhibit M at 2).

---

[2] The appellate court opinion on direct appeal states that Clark witnessed petitioner shoot Perry at "about 6 p.m." (Exhibit E at 2), while the opinion on the first postconviction appeal more precisely states that Clark witnessed petitioner shoot Perry "after 6:00 p.m." (Exhibit M at 2).

Ex 2 p. 3

Clark then entered Fish World and saw Perry lying injured on the floor and Truell standing over him. (Exhibit E at 3). Clark left Fish World to call 911 and returned there approximately one minute later. (Exhibit E at 3; Exhibit M at 2). Upon her return to Fish World, Clark saw petitioner standing in the restaurant. (*Id*). Clark explained that petitioner was wearing the same clothing he wore during the shooting and was acting like nothing had happened. (*Id*). Truell stated that petitioner returned to the restaurant about ten seconds after completing the shooting. (Exhibit M at 2-3).

The Chicago Police Department arrived and petitioner, Clark and Truell were transported in the same police car to the police station located at Kedzie and Harrison in Chicago, Illinois. (Exhibit E at 3, 5; Exhibit M at 3). Clark testified that prior to being placed in the police car, and again while being transported to the police station, petitioner told her to tell the police that she and petitioner were together at all times. (*Id*). Truell testified that he heard petitioner tell Clark that "you need to mind your business" while all three were sitting in the police car prior to being driven to the police station. (Exhibit E at 5; Exhibit M at 3).

At the police station, neither Clark nor Truell identified petitioner as the shooter. (Exhibit E at 5; Exhibit M at 3; Exhibit U at 3). Clark did tell the police that the shooter was wearing a black coat, black jeans, and a black "hoody," but she gave a wrong height for the shooter and failed to name petitioner as the shooter. (Exhibit E at 3; Exhibit M at 3; Exhibit U at 4). Clark later explained that she provided the wrong height information and did not identify petitioner as the shooter

-14-
Ex. 2 p. 4

because petitioner was at the police station at the time of her original statement on the night of the shooting. (*Id*). Petitioner's presence led Clark to fear that petitioner would later determine that she had identified him as the shooter. (*Id*). Approximately one month later, on January 7, 1999, Clark gave a second statement to the police in which she identified "Stan" as the shooter. (*Id*). She admitted that her original statement was inaccurate due to her fear that petitioner would have determined that she had identified him. (*Id*). On January 9, 1999, Clark identified petitioner in a lineup as the shooter. (*Id*).

Truell also failed to identify petitioner as the shooter when first taken to the police station on the night of the shooting. (Exhibit E at 5; Exhibit M at 3; Exhibit U at 4). Truell later explained that he believed at that time that Perry would survive the shooting and that Perry would "deal with" petitioner privately. (*Id*). Once Perry died two days later, Truell told the police that petitioner shot Perry. (*Id*). Truell identified petitioner in a photo array, and also identified him in a lineup on January 8, 1999. (*Id*).

Chicago Police Department Sergeant James Evans testified that petitioner was wearing a black hooded jacket the night he was arrested. (Exhibit E at 7; Exhibit M at 3-4). Clark and Truell both identified the jacket as the one that petitioner was wearing when he shot Perry. (Exhibit E at 7; Exhibit M at 4).

On cross examination, petitioner was able to impeach Clark and Truell on a number of issues. Clark stated that: (1) six months prior to the shooting, she was

convicted of a drug-related offense, and was on probation at the time of the petitioner's trial (Exhibit E at 3-4); (2) she had used heroin on the afternoon of the shooting (Exhibit E at 4; Exhibit M at 2); (3) she had consumed approximately one-half of a 40-ounce beer during the period between her conversation with petitioner at approximately 4:00 p.m. and the shooting (*id.*); (4) the sound of gunfire is what drew her attention to petitioner (Exhibit E at 4); (5) petitioner did not turn and face her when he fled the scene after the shooting (*id.*); (6) she stated in her grand jury testimony that she was "directly across the street from the restaurant" at the time of the shooting (*id.*); and (7) during an in-court re-enactment, in which Clark was positioned at the same vantage point and distance as she had during the shooting, Clark testified that she could not see petitioner's face. (*Id.*)

Petitioner also examined Truell about his ability to observe and perceive events at the time of the shooting. Truell stated that: (1) he had been drinking with Perry during the afternoon of the shooting, but had stopped about 4:30 p.m. and was not drunk at the time of the shooting (Exhibit E at 4); (2) he was on probation for a prior drug conviction at the time of petitioner's trial (*id.* at 6); (3) his back was to the door at the time of the shooting (*id.*); (4) he did not see the shooter before dropping to the ground (*id.*); (5) he could not see the door while he was on the ground (*id.*); (6) he did not turn his head to look towards the door until the shooting had stopped (*id.*); (7) he was afraid to look up while the shooter was still present out

of fear that he might be shot (*id.*); and (8) he saw petitioner as petitioner was walking out of the restaurant and viewed the side of petitioner's face. (*Id*).

Petitioner also introduced evidence regarding a previously recorded statement that Truell gave to petitioner's attorneys on March 9, 1999. (Exhibit E at 5, 7; Exhibit M at 4; Exhibit U at 4). In the March 1999 statement, Truell told petitioner's attorneys that: (1) he did not see who had fired the shots; (2) therefore he could not identify anyone as the shooter; and (3) the police had forced him to identify petitioner as the shooter. (Exhibit E at 6; Exhibit M at 4; Exhibit U at 4). Truell returned to petitioner's counsel's office on January 2000, approximately one and one-half months before petitioner's trial, read the transcript of his March 1999 statement and signed it. (Exhibit E at 6; Exhibit U at 4).

At trial, Truell repudiated the March 1999 statement and the corresponding January 2000 transcript. Truell explained that his aunt, Gwendolyn Truell, and petitioner were dating in March 1999. (Exhibit E at 5, Exhibit M at 4; Exhibit U at 4). She asked him questions about his statement to the police on approximately ten different occasions. (Exhibit E at 5). She also asked Truell to meet with petitioner's attorneys "quite a few times." (Exhibit E at 5; Exhibit M at 4). Truell explained that he acquiesced to his aunt's wishes and lied in his statement to petitioner's counsel because he was willing to say "anything" in order to get his aunt "away from him." (Exhibit E at 6; Exhibit M at 4; Exhibit U at 4). At trial, Truell testified that: (1) his prior statement to petitioner's counsel was false; (2) he saw petitioner shoot Perry at Fish World; (3) the police did not mistreat or threaten him to identify

petitioner as the shooter; (4) his prior statement to petitioner's counsel that the police mistreated him was a lie; and (5) his prior statement to petitioner's counsel that the police beat petitioner when they were questioning petitioner was also a lie. (*Id*).

Petitioner's counsel played Truell's recorded March 1999 statement during the defense's case-in-chief so that the trial court could hear Truell's manner, tone and demeanor on the recording. (Exhibit E at 7). The trial court explained that it would consider the admissible portions of the tape as substantive evidence. (*Id*).

The trial judge, acting in her capacity as the finder of fact, found Clark and Truell to be credible witnesses. (Exhibit E at 7, 8; Exhibit M at 4, 5). The court emphasized that Clark and Truell — who did not know each other prior to the shooting, but each independently knew petitioner — identified petitioner as the shooter. (Exhibit E at 7; Exhibit M at 4). This bolstered Clark and Truell's respective credibility as witnesses. (*Id*). The trial court recognized that both Clark and Truell failed to identify the shooter when they were first interviewed by the police on the night of the shooting. (*Id*). However, the trial court found their individual explanations — Clark's fear that petitioner would find out that she identified him and Truell's desire to allow Perry to settle the matter privately — were credible. (*Id*). In addition to corroborating each other's testimony, the trial court noted that both withstood a "painstakingly, lengthy cross examination about minutiae in this case" without altering their consistent testimony. (Exhibit M at 4, 5).

The trial court also rejected petitioner's argument that it was simply "bad luck" that he had arrived at the scene of the shooting dressed identically to the shooter. (Exhibit E at 7, 8). In discrediting Truell's March 1999 statement to petitioner's counsel, the trial court noted that the statement failed to mention that Truell's aunt was petitioner's girlfriend. (Exhibit E at 8). The trial court also accepted Truell's explanation that his aunt had continually pressured him to make the statement to petitioner's counsel and that the March 1999 statement was a product of that pressure. (*Id*). The trial court found petitioner guilty of first degree murder for the shooting death of Eugene Perry and sentenced him to 35 years' imprisonment. (Exhibit A at 5, 7; Exhibit E at 1; Exhibit M at 1; Exhibit U at 5).

## ~~III. PETITIONER'S CLAIMS BEFORE THIS COURT~~

Claims One, Three, Four, Five, Six, Seven, Nine and Ten are procedurally defaulted. All ten claims also fail on the merits. Consequently, this Court should deny the petition.

### A. Claims One, Three, Four, Five, Six, Seven, Nine and Ten Are Procedurally Defaulted.

Petitioner has procedurally defaulted Claims One, Three, Four, Five, Six, Seven, Nine and Ten because he failed to litigate them through one complete round in the state court proceedings. Although he raised these claims at various times in state postconviction proceedings, he failed to fully litigate these claims and ~~therefore cannot avoid procedural default. Claims One, Three, Five, Seven and Ten~~

-19-

Ex. 2 p. 9